STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTOPHER SCOTT FITZHUGH,
*Defendant-Appellant.*

Clatsop County Circuit Court
101231; A149719

317 P3d 371

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Erin C. Lagesen, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Defendant appeals his conviction for murder by abuse, ORS 163.115(1)(c).[1] One of the charged elements of that crime is that the victim have been a "dependent person," defined as "a person who because of either age or a physical or mental disability is dependent upon another to provide for the person's physical needs." ORS 163.205(2)(b). At issue in this appeal is whether the victim had a "physical *** disability" as that term is used in ORS 163.205(2)(b). In the trial court, defendant stipulated to the following facts: he assaulted the victim (his girlfriend); the injuries that he inflicted left her incapacitated for several days and ultimately caused her death; he did not seek medical care for her until shortly before she died; and, had she received medical care sooner, she might have lived. Nonetheless, defendant contends that the victim did not have a "physical disability" because, he argues, that term is limited to sustained or permanent conditions and does not include what he characterizes as a "*transitory* injury that makes a person *temporarily* reliant on another for help in performing the functions of daily life." (Emphasis added.) Accordingly, defendant argues, he was entitled to a judgment of acquittal on the charge of murder by abuse.

As explained below, we conclude that the term "physical disability" is not limited to disabilities that are permanent or enduring. Rather, the only temporal constraint to be found in the definition of "dependent person" is in the requirement that the person's mental or physical disability have rendered the person "dependent upon another" for some period of time. In this case, a factfinder could infer from the stipulated facts that the victim had a physical disability that left her completely reliant on defendant for a period of at least two days before she died. Such a finding would establish that the victim was a "dependent person" during that period of time. Accordingly, defendant was not entitled to a judgment of acquittal, and we affirm.

---

[1] Defendant was also convicted of two counts of assault in the second degree, ORS 163.175. He does not challenge those convictions on appeal.

As noted, the facts are not in dispute.[2] Defendant and the victim lived together in Astoria. Between April and July 2010, the victim sought medical attention several times for injuries consistent with domestic violence, giving explanations that the examining doctors found unconvincing. At the last of those medical visits, on July 23, the victim received a prescription for Vicodin but did not immediately have the prescription filled.

On the morning of July 25, 2010, a neighbor, Kidwell, heard a commotion at the apartment in which defendant and the victim lived, and he knocked on the apartment door. Defendant told him through the closed door that everything was all right. Kidwell heard the victim making a "gurgling" sound. Later in the day, defendant called Kidwell and told him that he had discovered that the victim had been having an affair and that he had hurt her "really bad." Defendant told Kidwell that he had taken the victim to the hospital and that she was currently in bed at home. Defendant had not actually taken the victim to the hospital.

The next day, defendant went to Kidwell's apartment and talked to Kidwell and his girlfriend, Harris. Defendant repeated what he had told Kidwell the day before and added that the police had handcuffed him at the hospital but could not arrest him because the victim told them that she had been injured in a "four-wheeler accident on the beach." Harris went with defendant to see the victim, who was lying on her bed. According to Harris, the victim's entire face, into her hairline, was black with bruises, as well as her ear and around her neck. Her face was so swollen that one eye was completely shut and her nose "almost came out to the edges of her eyes." The victim's other eye was "glossy" and "jumping all over," and the victim could not

---

[2] The state introduced the evidence that supported defendant's conviction at a bail hearing. Defendant later entered into a plea agreement with the state, in which he agreed to plead guilty to two counts of second-degree assault and to stipulate to the facts that were presented at the bail hearing, which defendant agreed would satisfy the elements of murder by abuse, other than whether the victim was a dependent person as defined in ORS 163.205(2)(b). Under the agreement, the sole issue that defendant could appeal is whether the victim was a dependent person. Also in that agreement, defendant acknowledged that, if he prevailed on that issue on appeal, he would be convicted of first-degree manslaughter as a lesser-included offense of murder by abuse.

focus. She told Harris, "Everything is okay." Her voice was rough and raspy, and Harris could hear a gurgling sound coming from her. In addition, the victim "smelled like she hadn't showered in a while" and had greasy hair. Harris, who had worked in nursing homes for the last 17 years, was very concerned about the victim, but, because defendant had told her and Kidwell that he had taken the victim to the hospital and that the police had been involved, they did not report the victim's condition to anyone.

Two days later, on July 28, defendant noticed that the victim's speech had started to become slurred. He told Kidwell and Harris that he had seen a doctor "walking around" the neighborhood, knew that the person was a doctor because he "had a doctor's bag," and asked him to see the victim, which, according to defendant, the doctor did. In the investigation that followed the victim's death, no evidence corroborating defendant's story was found.

The next day, defendant and the victim went to their bank and then to a pharmacy, where the victim filled the prescription for Vicodin that she had received on July 23. Later, they went to the management office of their apartment complex to pay the rent. The victim walked slowly with her hands in front of her as if she was having trouble balancing.

On July 30, two Coast Guardsmen helped defendant jumpstart the victim's car. The victim looked sick and remained in the passenger seat the entire time, but she was smoking a cigarette. Defendant told the Coast Guardsmen that the victim was a patient at the hospital and that he had just taken her out for lunch and had to get her back to the hospital.

On July 31, Harris wanted to visit the victim, but defendant said that she wanted to rest and did not want to see anyone that day.

The next morning, defendant asked Kidwell and Harris to call 9-1-1 because the victim was having a medical emergency. Defendant admitted to the paramedics and police officers who responded that he was responsible for the victim's injuries. The victim was taken to the hospital

in Astoria where a CT scan showed that her bowels had stopped functioning because of a lack of oxygen.[3] The victim was then transferred to a hospital in Portland, where she was treated for a subdural hematoma, among other things. She died later that day.

An autopsy showed the extent of the victim's injuries in addition to the subdural hematoma. She had bruises in various stages of healing on almost her entire body, which showed that she had been beaten at different times. Some of the bruises were at most two days old when the victim died, including one that covered her entire back. She also had 14 rib fractures, which were in four different stages of healing, including four fractures that were "very recent, probably days" old according to a medical examiner and four others that were somewhat further into the healing process but also "probably less than a week" old. One of the most recent broken ribs had punctured the victim's left lung, which led to a 50 percent collapse of the lung. The medical examiner stated that she would not expect someone in the victim's condition to be able to walk around, drink a soda, or smoke a cigarette—all of which the victim was seen doing two or three days before she died—without showing more discomfort than the victim displayed. According to the medical examiner, defendant likely assaulted the victim sometime after they were helped by the Coast Guardsmen, and the trauma to the victim from that assault was similar to being hit by a car.

The autopsy also revealed that the victim had no food or formed stool in her system, meaning that she had not eaten during the previous 12 to 24 hours. A toxicology exam showed that the victim had not taken any of the Vicodin that she had received at the pharmacy three days before she died. In addition, she was developing pneumonia in her right lung, "which meant that she was already not breathing all that well in the last day or so prior to her death."

---

[3] The medical examiner later discovered "pants that had been severely soiled with feces" on the apartment floor, which appeared inconsistent with the way in which the victim otherwise had kept her clothing neatly organized. The medical examiner testified that when a person's bowels stop functioning, as the victim's had, one of the symptoms is "overflow diarrhea."

According to the medical examiner, had the victim received medical attention a day or two sooner, it is possible that her life could have been saved.

Defendant was charged with, among other things, two counts of second-degree assault and one count of murder by abuse.[4] Defendant pleaded guilty to the assault charges and agreed to a stipulated facts trial on the murder charge. He conceded that there was "plenty of evidence" to support all of the elements of murder by abuse with the exception of whether the victim was a dependent person within the meaning of ORS 163.115(1)(c). The state's theory on that element was that the victim had become a dependent person for at least the last 48 hours of her life and that defendant's neglect of her worsening condition led directly to her death. The trial court agreed with the state's theory and found defendant guilty of murder by abuse.

On appeal, defendant renews his argument that the evidence was legally insufficient to prove that the victim was a dependent person for purposes of ORS 163.115(1)(c).[5] That statute provides that criminal homicide constitutes murder by abuse

"when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age or a dependent person, as defined in ORS 163.205, and:

"* * * * *

"(B) The person causes the death by neglect or maltreatment."

ORS 163.205(2)(b), in turn, defines "dependent person" as "a person who because of either age or a physical or mental disability is dependent upon another to provide for the person's physical needs."

---

[4] Defendant was also charged with three counts of aggravated murder and two counts of first-degree criminal mistreatment. Those charges were later dismissed.

[5] In his second assignment of error, defendant raises an additional argument that he acknowledges is unpreserved. We reject that argument without discussion.

Defendant does not contest the state's assertion that a factfinder could infer from the evidence that the victim's injuries were so serious that she was dependent on defendant for her basic needs during the last two days of her life. Instead, defendant argues only that those "transitory" injuries did not constitute a "physical disability" as that term is used in ORS 163.205(2)(b). According to defendant, "physical disability" has become a term of art in both common usage and statutory parlance and refers to a "sustained, often permanent, condition akin to what some call 'handicapped,'" not to "any transitory injury that makes a person temporarily reliant on another for help in performing the functions of daily life." Citing other statutes that include the word "disability," defendant contends that the legislature uses the term in connection with ensuring the rights of people with long-term or permanent disabilities, and he argues that we should infer from that context that the legislature intended the same meaning in ORS 163.205(2)(b).

The state responds that the legislature included no temporal limitation in ORS 163.205(2)(b), and it notes that statutory schemes addressing disabilities commonly differentiate between permanent and temporary disabilities. In the state's view, had the legislature intended the term "dependent person" to include only people with prolonged disabilities, it would have said so expressly, as it has in other statutes. According to the state, the extent of the disability, not its duration, is the key to determining whether someone is a dependent person.

The parties' arguments present a question of statutory interpretation. To determine the legislature's intent, we look to the text, context, and legislative history of ORS 163.205(2)(b). *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). Context includes other provisions of the same and related statutes. *State v. Maynard*, 168 Or App 118, 123, 5 P3d 1142 (2000), *rev den*, 332 Or 137 (2001). Again, ORS 163.205(2)(b) provides that a dependent person is "a person who because of either age or a physical or mental disability is dependent upon another to provide for the person's physical needs." The text of that provision does not

give any indication of whether the legislature intended that "disability" have a temporal quality, as defendant contends.

Other statutes that refer to disabilities undermine defendant's assertion that the legislature used the term "disability" as a term of art to refer to long-term impairments. ORS 163.205(2)(b) was enacted in 1981.[6] Or Laws 1981, ch 486, § 1. Some contemporaneous statutes included an express temporal qualification on the term "disability." For example, the workers' compensation statutes expressly referred to "permanent" disability and "temporary" disability. *See* ORS 656.206 - 656.214. Another statute, *former* ORS 237.171 (1981), *renumbered as* ORS 238.320 (1995), provided for "disability retirement" for certain public employees who were found to be "mentally or physically incapacitated for an extended duration," thus expressly excluding employees with short-term disabilities.

Contemporaneous statutes that did not include an express temporal qualification of the term "disability" illustrate that, when the term is not qualified, it cannot be understood to be limited to long-term disabilities. For example, ORS 253.065 was amended in 1981 to provide that the envelopes furnished with absentee ballots were required to include a statement, to be signed by the voter, stating that the voter, "[u]nless prevented by physical disability, has personally marked the ballot[.]" Or Laws 1981, ch 485, § 1. We can conceive of no reason to allow voters with permanent disabilities to obtain assistance, but not those with temporary disabilities that prevent them from personally marking their ballots. In that statute, it is not plausible that the term "physical disability" does not include temporary disabilities.

In short, defendant has not called our attention to, nor has our research disclosed, any statute in effect in 1981 that could reasonably be understood to apply only to long-term disabilities without the statute expressly saying so.

---

[6] Defendant cites a number of statutory provisions that were enacted after 1981. Later-enacted statutes are not context for what the legislature intended an earlier-enacted statute to mean. *State v. Neff*, 246 Or App 186, 192, 265 P3d 62 (2011). Because we are concerned here with the meaning of "dependent person," which was statutorily defined in 1981 in ORS 163.205, we consider as context only statutes enacted in or before 1981.

Nor does the legislative history of ORS 163.205(2)(b) support defendant's assertion that the legislature used the term "physical disability" to refer only to permanent or long-term impairments. As originally enacted in 1973, ORS 163.205 provided that a person committed first-degree criminal mistreatment if the person violated a legal duty to provide care for another person by withholding necessary and adequate food, physical care, or medical attention from that person. In 1981, the Oregon District Attorneys Association (ODAA) proposed adding a provision that would criminalize intentionally or knowingly injuring a dependent person under the actor's care, custody, or supervision. The proposed amendment included the definition of "dependent person" that now appears in ORS 163.205(2)(b). The ODAA submitted to the House Judiciary Committee an exhibit explaining the purpose of the amendment and the problem with the existing law that the amendment was meant to correct. The exhibit states that the amendment's purpose was to "enhance protection by the criminal justice system of people who by reason of either age and/or physical or mental handicap are dependent on others and therefore more vulnerable to physical abuse and less capable of reporting it." Testimony, House Committee on Judiciary, Subcommittee 3, HB 3058, May 1, 1981, Ex A at 1 (statement of John Bradley).

In explaining the problem with the existing law, the ODAA offered five hypothetical cases in which the conduct described was either not criminal or, in the ODAA's view, not treated with adequate severity. The hypothetical cases each involved a nursing home patient, a "mentally handicapped child," or a very young child. *Id.* at 1-2. The hypothetical cases meant to illustrate the inadequate severity of the existing law described conduct that then constituted only a Class A misdemeanor, fourth-degree assault. *Id.* at 2. The ODAA asserted, "Nowhere in the assault statutes is the increased vulnerability of a dependent person treated as an aggravating factor." *Id.* Testimony and discussion at the hearings on the proposed amendment also focused on abuse of children, elderly nursing-home patients, and mental patients. *See* Tape Recording, Senate Committee on Judiciary, Public Hearing, HB 3058, June 23, 1981, Tape 241, Side A (statements of Rep Dick Springer, Sen Jan Wyers, and John Bradley).

Defendant seizes on the testimony and discussion at the hearings, as well as the absence of any discussion indicating that the legislature intended for "dependent person" to include any person who is unable to care for himself or herself for any length of time because of a physical injury, and asserts that the legislative history "points to the meaning that a dependent person is someone whose condition is not transitory." The state responds that the legislative history shows that the legislature's objective was to enhance protection for people who are vulnerable because of age or physical or mental disability. The state asserts that that objective is advanced by treating as a "dependent person" any person who is so incapacitated as to be dependent on another, regardless of the duration of that dependent condition.

Our view of the legislative history is similar to the state's. At most, it shows that the legislature simply did not consider whether a person must have a long-term or permanent disability before being considered a "dependent person." Although the examples presented to the legislature did not include victims with temporary disabilities, the legislature's focus was on the vulnerability of the victim, not the duration of the disability. Accordingly, in construing the statute to determine what kinds of disabilities render a person dependent, it is appropriate to focus not on how long the disability was likely to last, but on whether the disability impaired the person to the extent that he or she was dependent on another to provide for the person's physical needs. *See South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986) ("Statutes ordinarily are drafted in order to address some known or identifiable problem, but the chosen solution may not always be narrowly confined to the precise problem. The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention.").

In short, the statutory context and legislative history of ORS 163.205(2)(b) do not support defendant's assertion that the legislature used the term "physical disability" as a term of art referring only to permanent or long-term impairments. Reading the term as being limited to permanent or long-term impairments would require us to "insert

what has been omitted" from the statute, which we may not do. ORS 174.010. Simply put, the term "physical disability" does not *itself* have a temporal aspect. Instead, what matters is the severity of the disability and its effect on the victim: the disability must have been serious enough that, as a result, the victim was "dependent upon another to provide for the [victim's] physical needs." ORS 163.205(2)(b).

We recognize that the requirement that the victim have been "dependent upon another" itself has temporal connotations, although not of the sort that defendant suggests. That part of the definition of "dependent person" suggests that the victim must *actually* have been dependent on another—that is, have needed physical assistance from another person—for some length of time. But nothing in ORS 163.205(2)(b) requires that time to have lasted so long that the person's disability could be thought of as either permanent or long-term.

In this case, the evidence to which defendant stipulated supports a finding that the victim was physically disabled from the injuries that defendant inflicted. Moreover, a factfinder could infer from the evidence regarding the severity and results of those injuries—including evidence that the victim had not been able to care for herself with respect to eating, bathing, taking the medication she had been prescribed, or getting to the bathroom—that, because of her disability, the victim had been dependent on another for her physical needs for a period of at least two days before she died. (Indeed, defendant does not contend otherwise.) It follows that the evidence was sufficient to allow a factfinder to determine that the victim was a dependent person within the meaning of ORS 163.205(2)(b).[7]

---

[7] We acknowledge that difficult questions may arise in cases involving a victim who became a dependent person only very shortly before his or her death, for example where an assailant beat a person severely enough to cause complete incapacitation and that person died a few minutes later, unable to care for himself or herself. Such a case could raise questions both about whether the victim was actually "dependent on another," ORS 163.205(2)(b), before his or her death and about whether the assailant's neglect of the victim during those few minutes—as opposed to the beating itself—could be said to have "cause[d] the [victim's] death" for purposes of ORS 163.115(1)(c)(B). This case does not require us to address those difficult questions, as defendant stipulated to the evidence showing that the victim's injuries left her incapacitated—*i.e.*, unable to care for herself—for at least two days.

To summarize, the sole issue that we address in this appeal is whether the evidence supported a determination that the victim was a dependent person within the meaning of ORS 163.205(2)(b). Defendant's argument that the victim was not a dependent person turns on his assertion that, where the dependent status is a result of physical disability, that disability must be long-term or permanent. The text, context, and legislative history of the statute do not support defendant's view. Furthermore, the record includes ample evidence to support a finding that the victim in this case was a dependent person, as her physical disability left her "dependent upon another to provide for [her] physical needs" in the days before she died. ORS 163.205(2)(b). Accordingly, we conclude that the trial court did not err in convicting defendant of murder by abuse.

Affirmed.